UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KEVIN S. ASH,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )          Case No. 2:10CV00043 AGF
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )


**<u>MEMORANDUM AND ORDER</u>**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Kevin S. Ash was not disabled

and, thus, not entitled to supplemental security income ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f.  For the reasons set forth below, the

decision of the Commissioner shall be affirmed.

Plaintiff, who was born on April 9, 1985, filed for benefits on April 11, 2006, at

the age of 21, alleging a disability onset date of January 1, 2005, due to Behçet's disease,[1]

ulcers in his mouth, fevers, rheumatoid arthritis, joint and back pain, and eye problems.

After Plaintiff's application was denied at the initial administrative level on June 8, 2006,

he requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing

---

[1]   Behçet's disease is a rare disorder that causes chronic inflammation in blood
vessels throughout the body.  Symptoms include painful mouth sores, skin lesions, sores
on the genitals, inflammation of the eye, joint swelling, and inflammation in veins and
large arteries.  *See Behçet's Disease* at http://www.mayoclinic.com/health/
behcets-disease/DS00822/DSECTION=1.  (Tr. 237-41.)

was held on January 17, 2008, at which Plaintiff, Plaintiff's mother, and a vocational expert ("VE") testified.

By decision dated March 13, 2008, the ALJ found that Plaintiff could not perform his past relevant work, but that, given his age, education, work experience, and residual functional capacity ("RFC"), there were other jobs that he could perform, and therefore, he was not disabled under the Social Security Act. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 21, 2010. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ failed properly to evaluate the severity of Plaintiff's Behçet's disease, failed to accord adequate weight to the opinion of Plaintiff's treating rheumatologist (Imelda Cabalar, M.D.) and dermatologist (Linda Cooke, M.D.), improperly discredited the statements of third parties, and improperly relied on the VE's testimony that was based upon an allegedly flawed RFC assessment by the ALJ. Plaintiff also asserts that the ALJ holds a bias against Social Security disability claimants who share similar characteristics with the Plaintiff.

## BACKGROUND

### Work History and Application Form (Tr. 46-47, 92-97, 103-05.)

Plaintiff reported that he worked full-time for his father as a carpenter from August 2002 through August 2004. This position required him to walk, stand, climb, reach, and handle big objects two hours each day; write, type or handle small objects one hour each

day; and sit, stoop, kneel, crouch, and crawl for half an hour each day. He reported that for most of the workday he lifted shingles, siding, and gutters a few feet, frequently lifting 50 pounds or more, with the heaviest weight lifted weighing 70 pounds. (Tr. 103-05.) There is no record of any earnings from this work and Plaintiff reported no other work since 2004. (Tr. 95.)

**Third-Party Statements (135-39, 141-43.)**

Plaintiff's mother submitted a Third-Party Report dated December 18, 2007. She stated that she did not feel Plaintiff could work because he experienced flare-ups from his Behçet's disease that caused fatigue, fever, sores in his mouth and on his bottom, and back pain, which could last up to four days, during which time Plaintiff would take to his bed. She stated that these flare-ups occurred from working in the heat, stress, and excitement. The sores in his mouth made it difficult for Plaintiff to speak, and she had trouble understanding him at times. She also noted that Plaintiff had problems with his eyes.

Plaintiff's mother reported that Plaintiff could only be on his feet for a short time before he started limping from pain in his knees and legs. Sometimes the pain became so bad that Plaintiff would sit on the floor of the store he was in at the time. She reported that Plaintiff could walk or stand for 15 minutes before having to sit or lie down; could sit for 30 minutes before having to stand up or lie down; could stand, walk, or sit for one hour each in an eight-hour day; and could pick up ten pounds with one hand, and 20 pounds with both hands. She also noted that Plaintiff had trouble with performing

household chores, he suffered from stress due to his pain, and he had trouble remembering things. (Tr. 135-39.)

Plaintiff's father also submitted a Third-Party Report dated December 18, 2007. He reported similar physical problems and pain, and noted that the pain sometimes affected Plaintiff's sleep. (Tr. 141-43.)

**Medical Records**

On February 6, 2006, Plaintiff visited Linda M. Cooke, M.D., a dermatologist, complaining of ulcers across his upper and lower lip, and his midline, as well as back pain. Plaintiff reported that he had not been taking his Dapsone[2] or using his Magic Mouthwash.[3] Dr. Cooke diagnosed Plaintiff with an exacerbation of his Behçet's disease and advised him to take 50 mg of Dapsone twice daily. She also recommended that Plaintiff take 200 mg of Motrin for his back pain, three times daily, and provided him with an informational printout regarding ankylosing spondylitis.[4] (Tr. 152.) On February 28, 2006, an x-ray of Plaintiff's lumbar spine revealed no abnormalities. (Tr. 153.)

On March 23, 2006, Plaintiff visited Imelda P. Cabalar, M.D., a rheumatologist, complaining of knee and back pain. Plaintiff reported that Tylenol took care of his knee

---

[2] Dapsone is an antiinfective medication used in the treatment of dermatitis herpetiformis and leprosy. *See Dapsone* at http://www.drugs.com/mtm/Dapsone.html.

[3] Magic Mouthwash is a topical mucositis agent. *See Magic Mouthwash* at http://www.drugs.com/ppa/magic-mouthwash.html.

[4] Ankylosing spondylitis, also known as inflammatory spondyloarthropathy, is a long-term disease that causes inflammation of the joints between the spinal bones, and the joints between the spine and pelvis. It eventually causes the affected spinal bones to join together. *See Ankylosing Spondylitis* at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001457/.

pain, but stated that his back pain was about a 6 to 7 out of a 10-point severity scale and became worse when he stood or walked for any length of time. Plaintiff also reported morning stiffness that lasted approximately 30 minutes, but denied any pain or swelling in his hands. Dr. Cabalar noted that Plaintiff had one oral ulcer on the tip of his tongue and had tenderness in his lumbosacral area with paravertebral muscle spasms, but noted that Plaintiff had no other areas of tenderness, had a full range of motion, and did not complain of dry eyes. She noted that Plaintiff's history and exam were not entirely consistent with rheumatoid arthritis, prescribed 500 mg of naproxyn[5] twice a day for Plaintiff's pain, and ordered lab work and x-rays of his sacroiliac joints. (Tr. 155-56.) Plaintiff's x-rays were normal. (Tr. 157.)

On April 3, 2006, Plaintiff returned to Dr. Cooke, complaining of an outbreak of Behçet's disease in his mouth and on his bottom area. Dr. Cooke diagnosed Plaintiff with an exacerbation of his Behçet's disease and increased his Dapsone prescription to 150 mg daily. (Tr. 158.)

On April 20, 2006, Plaintiff returned to Dr. Cabalar, complaining of pain in his knees and the back of his neck, as well as occasional pain in his shoulders and elbows. He described the pain as a 5 out of 10, and stated that he was feeling better and that the naproxyn was helping. He denied any joint swelling and stated that his morning stiffness lasted up to 15 minutes. Dr. Cabalar noted that Plaintiff's previous lab work had been normal, he had a full range of motion, and his only tenderness was in his cervical spine

_____

[5]     Naproxyn is used to treat pain or inflammation caused by arthritis, ankylosing spondylitis, tendinitis, and gout. *See Naproxyn* at http://www.drugs.com/naproxen.html.

with paravertebral muscle spasms.  She diagnosed Plaintiff with Behçet's disease and inflammatory spondyloarthropathy, continued Plaintiff's naproxyn prescription, and ordered x-rays of Plaintiff's cervical spine.  (Tr. 159-60.)  Plaintiff's x-rays were normal. (Tr. 161.)

On April 21, 2006, Plaintiff completed a Function Report in conjunction with his application for disability benefits.  Plaintiff reported that he lived with his family in a house.  He reported that on a typical day he would get up, get something to drink, and take his pills.  He would then watch television and movies, play video games, feed and water the dog, and take out the trash if needed.  He also prepared sandwiches for himself three to four times per week.  He stated that his pain kept him awake and caused him to "toss and turn all night;" however, he reported no problems with his personal care.  He was able to go outside once or twice each day, and went shopping.  His impairments had affected his hobbies because sitting too long hurt his back, so he was constantly getting up and down, but they had not affected his social activities.  Plaintiff reported that he had trouble lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, and concentrating, due to his pain.  He stated that he could sit, squat, kneel, stand, and walk for 30 minutes before he needed to rest; could lift 15 to 20 pounds; could bend or go up and down stairs for 15 minutes at the most; needed to rest approximately 30 minutes before he could resume walking; and could pay attention for 30 minutes to one hour.  He also stated that he used glasses, which were prescribed on April 10, 2006, for reading, night driving, playing video games, and using his computer.  (Tr. 116-23.)

Plaintiff returned to Dr. Cooke on May 8, 2006 for a re-evaluation of his Behçet's disease. Dr. Cooke noted one small ulcer on Plaintiff's lower lip and some inflammatory papules on his face, but noted that the remainder of his skin was within normal limits. She discontinued Plaintiff's Dapsone prescription and started Plaintiff on 100 mg doxcycline[6] twice daily for his Behçet's disease, noting that she intended to eventually reduce that dosage to 20 mg twice daily if he remained clear. (Tr. 182.)

Dr. Cooke also completed a Medical Source Statement ("MSS") for Plaintiff on May 8, 2006. Dr. Cooke indicated that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand, walk and/or sit (with normal breaks) for about six hours in an eight-hour workday, but may be limited to at least two hours in an eight-hour workday when he was symptomatic. She also indicated that Plaintiff had no postural or manipulative limitations when he was asymptomatic. However, when he was symptomatic, he was limited to only occasional balancing or bending; could never climb, stoop, kneel, crouch, crawl, squat, or twist; and was limited in his manipulation. Dr. Cooke also assessed Plaintiff as having environmental limitations, and indicated that Plaintiff should avoid concentrated exposure to working with machinery, should avoid even moderate exposure to working at heights, and should avoid all exposure to temperature extremes, working near chemicals/fumes, and tolerating vibration. Dr. Cooke noted that Behçet's disease can last years, especially in men who

---

[6]    Doxycycline is an antibiotic used to treat many different bacterial infections. *See Doxycycline* at http://www.drugs.com/doxycycline.html.

often have worse disease symptoms, and noted that when Plaintiff was symptomatic, he would most likely have difficultly working. (Tr. 230-31.)

Plaintiff returned to Dr. Cooke on May 23, 2006, complaining of sores on his lips, an upset stomach, difficulty sleeping, and muscle pain. Dr. Cooke prescribed Magic Mouthwash and 100 mg daily of Dapsone, and continued Plaintiff on 100 mg doxycycline twice daily. (Tr. 183.) When Plaintiff returned for re-evaluation on June 6, 2006, Plaintiff reported significant improvement of his symptoms and Dr. Cooke diagnosed Plaintiff with well controlled Behçet's disease. She also continued his doxycycline prescription and decreased his Dapsone prescription to 75 mg daily, with instructions to taper his dosage until he had a flare-up of symptoms. (Tr. 184-85.)

On June 8, 2006, L. Masek, a medical consultant, performed a Physical Residual Functional Capacity Assessment based upon Plaintiff's medical records. Masek indicated that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand, walk, and/or sit (with normal breaks) for a total of about six hours in an eight-hour workday; and could push and/or pull without limitation, other than as noted for lifting and/or carrying. Masek noted that with regard to Plaintiff's postural limitations, Plaintiff could balance frequently; could climb ramps, stairs, ladders, ropes and scaffolds occasionally; and could stoop, kneel, crouch, and crawl occasionally. In addition, Masek noted that Plaintiff should limit those postures as necessary to reduce exacerbations of his joint pain. Masek assessed Plaintiff as having no manipulative, visual, communicative, or environmental limitations.

Masek noted that Plaintiff reported pain that kept him awake at night; mostly played video games, watched television and listened to music; had no license to drive; complained that his back hurt if he sat too long; complained of pain setting in after approximately 30 minutes of static activity; could walk for approximately 30 minutes; got along fine with others; and had no trouble paying attention. Masek concluded that Plaintiff's "complaints are generally consistent with the [medical evidence in the record] and are credible." (Tr. 162-67.)

Plaintiff visited Dr. Cabalar on June 22, 2006, complaining of back pain at a level 7 out of 10. Plaintiff reported that he had been doing well until four days earlier when the pain began, and that while 500 mg of naproxyn taken twice daily had helped in the beginning, it did not help with the present back pain. He also reported having morning stiffness lasting up to 15 minutes and that he had oral ulcers. Dr. Cabalar noted that Plaintiff's range of motion and tenderness were unchanged; ordered lab work, an x-ray of Plaintiff's thoracic spine, and a chest x-ray; prescribed 10 mg Flexeril[7] at bedtime as needed for his pain; and continued Plaintiff's naproxyn prescription. (Tr. 194.) On July 7, 2006, Plaintiff reported that his back pain and oral ulcers were better, and he had minimal morning stiffness. Dr. Cabalar noted that Plaintiff's lab work and chest x-ray had been normal, but his thoracic spine x-ray revealed early spondylosis of his lower thoracic spine. Dr. Cabalar's physical examination of Plaintiff revealed a full range of

---

[7]    Flexeril is a muscle relaxant. *See Flexeril* at http://www.drugs.com/flexeril.html.

motion and no tenderness, and she prescribed 50 mg of Imuran[8] to be taken daily for the first week, and twice daily thereafter. (Tr. 195-200.)

On July 18, 2006, Plaintiff again followed up with Dr. Cooke complaining of ulcers on his lips. Dr. Cooke continued to recommend medication, noting that once Plaintiff's symptoms improved with the Imuran, his Dapsone could be discontinued. (Tr. 186-87.)

On August 7, 2006, Plaintiff visited Dr. Cabalar, reporting that he had not had any flare-ups of ulcers in three weeks and had only slight morning stiffness, and denying any flare-up in his back pain. Dr. Cabalar noted that Plaintiff had a full range of motion and did not complain of any tenderness upon physical examination, and continued to recommend medication. (Tr. 200-01.) At his October 2, 2006 follow-up visit, Plaintiff reported that he had been doing well, and while he had occasional oral ulcers, they were not as bad as before. He also denied having any joint pain and reported only minimal morning stiffness. Dr. Cabalar again noted Plaintiff's full range of motion and lack of tenderness, maintained her diagnosis, and continued Plaintiff's Imuran prescription. (Tr. 202.) Plaintiff had a follow-up visit with Dr. Cabalar again on January 22, 2007, and reported having stopped taking his Imuran prescription three months earlier. Dr. Cabalar restarted Plaintiff's Imuran prescription. (Tr. 203.)

After another recurrence of oral ulcers and back pain, Plaintiff contacted Dr. Cabalar, who prescribed Magic Mouthwash and 10 mg of Flexeril, each to be taken three

_____

[8] Imuran, or azathioprine, is used in the management of active rheumatoid arthritis. *See Azathioprine* at http://www.drugs.com/pro/azathioprine.html.

times per day. Plaintiff followed-up with Dr. Cabalar on March 6, 2007, and reported that the mouthwash and Flexeril had helped, the oral ulcers were almost gone, and his back pain was resolved. (Tr. 204-05.)

On May 14, 2007, Dr. Cabalar noted that Plaintiff had two shallow ulcers on the right side of his tongue, but exhibited a full range of motion and no tenderness. (Tr. 206.) On August 20, 2007, Plaintiff reported to Dr. Cabalar that he had been doing "really well apart from occasional mild low back pain and knee pain," with minimal morning stiffness, no joint swelling, and only a few oral ulcers that "come and go." (Tr. 207.) Plaintiff reported similar improvement at a follow-up appointment with Dr. Cabalar on November 27, 2007. (Tr. 208.)

On May 14, 2007, Dr. Cabalar completed a Medical Source Statement ("MSS") for Plaintiff. Dr. Cabalar indicated that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday; and could sit (with normal breaks) for less than about six hours in an eight-hour workday. She also indicated that Plaintiff's ability to push and/or pull was limited in his lower extremities by his lower back pain, which was aggravated by pushing or pulling. In support of these limitations, Dr. Cabalar cited Plaintiff's thoracic spine x-ray which showed evidence of spondylosis in Plaintiff's lower thoracic spine, his Behçet's disease, and his recurrent lower back pain from inflammatory spondyloarthropathy.

With regard to Plaintiff's postural limitations, Dr. Cabalar noted that Plaintiff could crouch, crawl, and stoop frequently; could climb ramps, stairs, ladders, ropes and

scaffolds occasionally; and could never balance or kneel. Dr. Cabalar again cited Plaintiff's recurrent lower back pain from inflammatory spondyloarthropathy and his spondylosis, in support of these limitations. Dr. Cabalar assessed Plaintiff as having no manipulative, visual, or communicative limitations; however, Dr. Cabalar assessed Plaintiff as having environmental limitations with respect to dust, humidity and wetness, and hazards. Dr. Cabalar indicated that the humidity and wetness would exacerbate Plaintiff's Behçet's disease, the dust would cause allergies, and the hazards were limited because of Plaintiff's lower back pain. (Tr. 225-228.)

Plaintiff returned to Dr. Cabalar for a follow-up visit on February 26, 2008, reporting that he had been "doing well apart from some stiffness at the back of his neck," but he was experiencing no pain and had only a couple of oral ulcers, which he noted was "not like what he had before." (Tr. 244-45.) On February 28, 2008, Plaintiff called Dr. Cabalar complaining of sores in his mouth and diffuse achiness that had begun the night before. Dr. Cabalar prescribed Magic Mouthwash three times a day and as needed. (Tr. 245.)

**Evidentiary Hearing of January 17, 2008 (Tr. 20-55.)**

Plaintiff, who was represented by counsel, testified that he was 22 years old and lived with his parents. He had an 8th grade education, had obtained his GED in October 2004, but had no additional schooling. He did not have his driver's license because he had failed the test three times, and stated that he had never worked outside the home.

Plaintiff testified about his knee and back pain, as well as his Behçet's disease. He indicated that these conditions made it hard to work in the heat or the cold because those

temperatures caused flare-ups of his Behçet's disease, which resulted in sores in his mouth, a low-grade fever, and fatigue.

Plaintiff testified that he sometimes woke up at 8:00 a.m., but at least four to six times per week he did not wake up until 12:00 p.m. or 1:00 p.m. because his Behçet's disease made him very fatigued and made it hard for him to wake up. He normally went to bed between 10:00 p.m. and 12:00 a.m. He spent his days watching television, playing video games, and playing cards on the computer. He also helped his mother around the house by taking out the trash, sometimes making the beds and vacuuming, retrieving items from the basement, and taking care of the family's large dog, but he did not do any laundry. When he got tired, he would take a nap, and he testified that he could not remember the last day he did not take a nap. Plaintiff reported that he had no difficulty taking care of his personal needs and did not need any assistive devices to get around. However, he reported that he did not sleep through the night because of his back pain and the sores in his mouth, and typically woke up two to three times each night.

Plaintiff stated that he was taking azathioprine, which he took twice a day for his back pain and his Behçet's disease; cyclobenzaprine,[9] which he took once every four to six months for his back pain; Magic Mouthwash and Carafate,[10] both of which were prescription mouthwashes which he took three and four times per day, respectively, when

---

[9]    Cyclobenzaprine is a muscle relaxant. *See Clyclobenzaprine* at http://www.drugs.com/cyclobenzaprine.html.

[10]    Carafate is used to treat active duodenal ulcers. *See Carafate* at http://www.drugs.com/carafate.html.

he had sores in his mouth; ibuprofen[11] which he took for his back pain; and eye drops for when his eyes feel dry or start watering. Plaintiff did not like taking cyclobenzaprine because it made him feel "real tired," and it made his body feel "kind of numb." He also stated that the ibuprofen did not help with his back pain very often. He had taken Dapsone and naproxyn in the past, but his doctor had ordered him to discontinue using them because they did not work.

Plaintiff testified that he had astigmatism, which made it difficult for him to read, and his glasses did not help. He read video game magazines "once in a while." He also testified that when he sat in front of the computer, his eyed would water, become irritated, dry, and hard to open, and would cause him pain. The watering and irritation were worse during his Behçet's disease flare-ups.

Plaintiff had little social contact with people outside of his family, but did interact with the staff at the video game store he visited every week or two. He also testified that he would go to the grocery store or shopping. After failing out of eighth grade, he was home schooled and later received his GED.

He testified that the cycles of his Behçet's disease were hard to predict, his flare-ups would last between four and seven days, and sometimes he would go a week without a flare-up. His mouth was most prone to flare-ups, and the sores in his mouth made it difficult for him to eat and speak clearly. He testified that on occasion, people had difficulty understanding him because of the sores in his mouth. The sores also caused

---

[11]    Ibuprofen is a nonsteroidal anti-inflammatory drug. *See Ibuprofen* at http://www.drugs.com/mtm/ibuprofen.html.

him to have a lot of saliva in his mouth, so he constantly had to spit, and he had trouble keeping his mouth closed when he had sores, so he drooled. His back, shoulders, knees, elbows, and fingers sometimes also hurt during his flare-ups, and he did not help around the house, take care of the dogs, or play computer or video games during his flare-ups. During a flare-up, Plaintiff testified that he had difficulty staying focused and thinking because of the pain and fatigue, so he stayed in bed and slept or watched television and dozed off and on.

Plaintiff testified that he could sit for 30 minutes to an hour, but during a Behçet's disease flare-up he usually fell asleep when he was sitting down. He also testified that because of his knee pain, he could not be on his feet for more than 15 to 30 minutes at a time, after which he had to sit down for 30 minutes to one hour to alleviate the pain. He stated that he stayed in bed most of the time because of these limitations.

Plaintiff testified that his lower back pain was due to inflammatory spondyloarthropathy, which prevented him from lifting anything more than ten pounds, a limit imposed by his doctor, Dr. Cabalar. He also testified that lifting items over ten pounds, being on his feet for longer than 15 to 30 minutes, bending over, sitting uncomfortably, or experiencing tension, all caused his lower back to tighten and hurt such that it was hard for him to move. He estimated that he could stand for one to one and a half hours total in a day without hurting his back too badly to stand. Lastly, Plaintiff testified that he had been covered by Medicaid for approximately six to seven months.

Plaintiff's mother testified that Plaintiff's eye doctor believed that his eye problems were connected to his Behçet's disease. Plaintiff's eye drops were samples of

prescriptions given to Plaintiff by his eye doctor, as well as a gel type medication that Plaintiff's mother purchased for him over the counter. She estimated that Plaintiff used his eye drops once every two weeks, but noted that it depended on how much pain he had. She explained that the length of Plaintiff's Behçet's disease flare-ups depended on the amount of activity he had been doing, and his flare-ups happened when they were out shopping and walking around, and when he was up on his feet and moving around.

The VE reviewed Plaintiff's work history, and through questions posed to Plaintiff, clarified that Plaintiff's past work was as a construction laborer doing siding, gutters and basic remodeling. Plaintiff noted that he was not having Behçet's disease flare-ups while working in that job. The VE then stated that Plaintiff's past work as a construction laborer was classified as heavy and unskilled work.

The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's age, education, and past work experience; who could lift 20 pounds occasionally and 10 pounds frequently; could stand or walk six out of eight hours with normal breaks; could sit at least six out of eight hours; could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold and heat, and to heavy-duty full-body vibrations, like riding in a tractor trailer or cab or using a jackhammer. The VE stated that such an individual could not perform Plaintiff's past work, but testified that such an individual could perform other jobs in the light work category[12] such as in retail

_____

[12]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten

sales type positions, as a cashier, or as a counter and office cleaner in office cleaning type of work, all of which were available in significant numbers in both the local and national economy. The VE then testified that an individual with the same criteria as above, but who would also be limited to sedentary work,[13] would be able to perform jobs such as small product assembly type work, telemarketing type positions, and some sedentary cashier positions, all of which were available in significant numbers in both the local and national economy. However, the VE testified that if either of the above hypothetical individuals was also limited to jobs that did not require interaction with the public which required extensive oral communication, or more than brief yes or no answers, neither hypothetical individual would be able to work as a cashier, or in retail sales or telemarketing.

The VE then testified that an individual with the original criteria, but who would also be limited to standing between two to six hours a day and sitting less than six hours a day; could alternate between sitting and standing, but could only sit and/or stand the

_____

pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls. Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *6, elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.

[13] "Sedentary work" involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; sitting for about six hours and standing for up to about two hours in an eight-hour workday. 20 C.F.R. § 404.1567(a); Social Security Ruling 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

maximum at any one time of about an hour; and would have some need to get up and/or sit down briefly, but not to leave the work setting, would be able to perform the assembly jobs. However, if that hypothetical individual needed to change positions for one hour at a time, the VE testified that it would likely eliminate those jobs.

The VE also testified that a person at any of the above-mentioned exertional levels who would miss work consistently more than two days each month, would be "let go in short order." The VE also testified that a person at any of the exertional levels that she had found jobs, who would show up for work every day, but for medical reasons randomly one day a week would show up late to work, leave early from work, or be away from the work setting the equivalent of an additional break that day, would "over time" be precluded from employment in those types of jobs.

Lastly, the ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education, and past work experience; who could lift 20 pounds occasionally and 10 pounds frequently; could stand or walk at least two out of eight hours; could sit less than six out of eight hours; who is limited in the lower extremities by low back pain which is aggravated by pushing and pulling; whose clinical findings supported by X-rays of the thoracic spine showed evidence of spondylosis in the lower thoracic spine; who has Behçet's disease and recurrent low back pain from inflammatory spondyloarthropathy; could occasionally climb stairs, ramps, ladders, ropes, and scaffolds, but never balance or kneel due to the recurrent low back pain due to inflammatory spondyloarthropathy and spondylosis; should be protected from, or not allowed to work in environments where

there are, dust, humidity, wetness, or hazards.  The VE stated that such an individual could not perform a full-time sedentary assembly job.

**ALJ's Decision of March 13, 2008 (Tr. 11-17.)**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the end of 2004.  The medical evidence established that Plaintiff had Behçet's disease and inflammatory spondyloarthropathy, which were controlled by medication.  However, the ALJ found that none of these impairments, singly or in combination, met or equaled a deemed-disabling impairment listed in the Commissioner's regulations.

After consideration of the record, the ALJ found that Plaintiff had the RFC to perform the physical exertional and nonexertional requirements of work, except for lifting or carrying more than ten pounds frequently or more than 20 pounds occasionally, climbing, balancing, kneeling, or any concentrated or excessive exposure to wetness, humidity, temperature extremes, or vibrations.  Citing Polaski v. Heckler, 739 F.2d 1321 (8th Cir. 1984), the ALJ found the preponderance of the medical and other evidence to be inconsistent with Plaintiff's allegation of disability.

In support of his RFC assessment, the ALJ summarized Plaintiff's education, work and medical history, and concluded that the evidence in the record was inconsistent with Plaintiff's allegation of disability.  He noted Plaintiff's alleged symptoms due to his impairments were not supported by documented evidence, and noted that Plaintiff did not exhibit any signs typically associated with chronic, severe musculoskeletal pain, nor did the medical evidence establish that Plaintiff had an inability to ambulate effectively or perform fine and gross movements effectively on a sustained basis due to any underlying

19

musculoskeletal impairment.  The ALJ also stated that to the extent that the Plaintiff's daily activities were restricted, they were restricted "much more so by his choice than by any apparent medical proscription."  Therefore, the ALJ concluded that Plaintiff's allegations, and those of his parents, of his impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity were not credible to the extent that they were inconsistent with the ALJ's RFC determination.

The ALJ summarized Dr. Cooke's and Dr. Cabalar's MSS opinions that indicated that Plaintiff was limited in standing, walking, sitting, lifting, carrying, bending, and doing other exertional activities, but determined that those limitations were "ones indicating what [Plaintiff] is typically like when he has a significant flare-up of his Behçet's syndrome," and noted that according to the medical records, those flare-ups did "not occur very often at all."  The ALJ also determined that Dr. Cabalar's suggestion that back pain alone accounts for some of the limitations was inconsistent with both her own clinical notes, and those of Dr. Cooke, "which show nearly all of the time [Plaintiff's] medical conditions are stable and well controlled by medication, with very infrequent, mild, and temporary signs and symptoms."  The ALJ noted that Plaintiff had no x-ray evidence of any impairment of the lumbosacral spine, cervical spine or any joint; had only early spondylosis of the thoracic spine; and had no documented evidence of any visual impairment.  Accordingly, the ALJ determined that there was "really no credible medical reason [Plaintiff] cannot do the light exertion jobs identified by the [VE]" because "Dr. Cabalar cited no obvious medical reason why [Plaintiff's] standing and

walking should be significantly limited, but even if her assessment in Exhibit 6F is medically accurate, [Plaintiff] could still do a significant number of sedentary jobs identified by the [VE]."

The ALJ found that Plaintiff either had no past relevant work or was unable to perform his past relevant work. Relying on the VE's testimony that a person of Plaintiff's age, education, work experience, and RFC for light or sedentary work with limitations, could perform jobs such as retail sales clerk, cashier, and janitor/cleaner, which were available in significant numbers in the national economy, the ALJ determined that Plaintiff was not disabled. The ALJ reached the same conclusion by application of the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. *Id.* (quoting *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" *Id.* (quoting *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). "Reversal is not warranted, however, 'merely because substantial evidence would have

supported an opposite decision.'" *Id.* (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

*Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1. If so, the claimant is

conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity to perform his past relevant work, if any.  If the claimant can return to past relevant work, the claimant is not disabled.  Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a vocational expert as to the availability of jobs that a person with the claimant's profile could perform.  *Baker v. Barnhart*, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

## Plaintiff's Behçet's Disease

Plaintiff argues that the ALJ erred in finding that his Behçet's Disease did not meet or equal a deemed-disabling impairment under Listing 8.04 of the Commissioner's regulations.  A claimant meets Listing 8.04 if he can show: "chronic infections of the skin

or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed."  20 C.F.R. Pt. 404, subpt. P, app. 1, § 8.04.  Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation on the use of more than one extremity, on the ability to do fine and gross motor movements, or on the ability to ambulate.  20 C.F.R. Pt. 404, subpt. P, app. 1, § 8.00(C)(1).

The Court finds that Plaintiff has not produced medical evidence to support his contention that his Behçet's Disease produced serious limitations, as defined by the Regulations.  To show that he meets the Listing, Plaintiff "must meet *all* of the specified medical criteria."  *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir.1995).  The medical evidence in the record reflects that Plaintiff's ulcers are limited to his mouth and bottom, and there is no medical evidence in the record that Plaintiff's ulcers result in a "very serious limitation," as defined by the Regulation.  (Tr. 155-56, 158, 182-83, 186, 202-04, 207-08, 244.)  Nor is there medical evidence to support a finding that Plaintiff's ulcers "persist for at least 3 months."  Dr. Cabalar's treatment records indicate that Plaintiff's ulcers are "occasional" and "come and go."  (Tr. 202, 207-08.)

Accordingly, the Court finds Plaintiff did not meet his burden of showing that the medical findings related to his Behçet's Disease equal in severity and duration a deemed-disabling impairment under Listing 8.04.  Thus, the Court finds that the ALJ committed no error in this regard.

**Third-Party Statements**

Plaintiff argues that the ALJ improperly evaluated the third-party witness statements submitted by Plaintiff's mother and father. Specifically, the Plaintiff challenges the ALJ's statement that:

> First, these persons are not medically trained to make exacting clinical determinations and observations concerning dates, frequencies, or types and degrees of medical signs and symptoms, or the frequency and intensity of certain moods and mannerisms. Second, their statements were undoubtedly influenced somewhat by their affection toward the claimant and natural tendency to believe and support him. Third, and most important, their statements, like the claimant's testimony, were inconsistent with the preponderance of the opinions and observations by qualified medical personnel in this case. (Tr. 15.)

This Court finds that the ALJ properly considered the testimony of Plaintiff's parents and refused to put controlling weight on it for acceptable reasons. In addition to correctly noting that the third-party witnesses were not medically trained, and therefore did not have the expertise to make exacting clinical determinations and observations, the ALJ noted that they had a motivation as family members to help Plaintiff obtain his benefits. *See Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996). In addition, the ALJ discounted their statements due to a lack of support in the record. *Id.* While Plaintiff's parents reported that Plaintiff's Behçet's Disease caused Plaintiff to experience fatigue, run a fever and take to bed, a review of the record reveals that neither of Plaintiff's physicians recorded such allegations in their treatment notes, and instead repeatedly noted that Plaintiff did not have a fever. (Tr. 155, 200, 202-04, 207-08.) Plaintiff's parents also placed much more extreme limitations on his walking, sitting, and standing than those opined by Plaintiff's treating physicians and the state medical consultant. (Tr.

135-43.)  Therefore, the Court finds that the ALJ properly discounted the third-party witnesses' credibility.

**The Weight to be Given to the Treating Physicians**

Plaintiff argues that the ALJ erred making his RFC determination, by failing to give the opinions of Dr. Cooke and Dr. Cabalar controlling weight.  Plaintiff alleges that the ALJ erred in thereafter concluding that Plaintiff could perform other work.

A disability claimant's RFC is the most he or she can still do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  In *McCoy v. Schweiker*, 683 F.2d 1138 (8th Cir. 1982) (en banc) (abrogated on other grounds), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  *Id.* at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC.  *Id.*  As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'"  *Id.* at 1023 (quoting *Hutsell v. Massanari*, 259 F.3d 7, 711 (8th Cir. 2001).  The ALJ is therefore required to consider at

least some supporting evidence from a medical professional.  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).

The record indicates that Dr. Cooke was Plaintiff's treating physician from February 2006 through at least July 2006, and Dr. Cabalar was Plaintiff's treating physician from March 2006 through at least February 2008.  (Tr. 152, 155, 186-87, 245.) The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area.  20 C.F.R. § 404.1527(d).  The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Id.* § 404.1527(d)(2); *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009).  However, "[a] treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objected medical evidence in the record."  *Cain v. Barnhart*, 197 F. App'x. 531, 533-34 (8th Cir. 2006).

The ALJ rejected the "rather extensive limitations" contained within the MSS opinions of Dr. Cooke and Dr. Cabalar, finding that while they were indicative of what Plaintiff was like during a "significant flare-up of his Behçet's syndrome,""those flare-ups do not occur very often at all."  (Tr. 14, 225-28, 230-31.)  The Court finds that substantial evidence exists in the record to support the ALJ's finding that the MSS

opinions of Dr. Cooke and Dr. Cabalar were not entitled to controlling weight because they were inconsistent with their own treatment notes. For instance, on June 6, 2006, Dr. Cooke noted that Plaintiff reported a significant improvement of his symptoms, and Dr. Cooke assessed Plaintiff's Behçet's disease as "well controlled." (Tr. 184.) On August 7, 2006, Plaintiff reported to Cabalar that he had not had any flare-ups for three weeks. (Tr. 200-01.) And after a flare-up in early March, Plaintiff reported to Dr. Cabalar that his ulcers were almost gone after treating them with Magic Mouthwash. (Tr. 204-05.) Moreover, despite Dr. Cooke's and Dr. Cabalar's MSS statements regarding Plaintiff's Behçet's disease, on several occasions that Plaintiff complained of ulcers relating to his Behçet's disease, he stated that he otherwise felt well, and frequently reported that his flare-ups of ulcers were "much better" or "not as bad as before." (Tr. 186-87, 199-200, 202-203, 207-208, 244-45.)

"If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Astrue*, 611 F.3d 941, 655 (8th Cir. 2010) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)). The Court finds that there is substantial evidence in the record to support the ALJ's findings that Plaintiff's flare-ups did not occur very often, and when they did occur, they were not very significant. Accordingly, the Court finds that there was substantial evidence in the record to support the ALJ's finding that the MSS opinions of Dr. Cooke and Dr. Cabalar regarding Plaintiff's limitations due to his Behçet's disease were not entitled to controlling weight.

The ALJ also found that "Dr. Cabalar's suggestion that back pain alone accounts for some of the limitations does not coincide with her own clinical notes, or those of Dr.

Cooke's . . . ," and the Court finds substantial evidence in the record supporting this finding. (Tr. 14.) Dr. Cabalar's treatment notes indicate that Plaintiff always had a full range of motion throughout his body, and she only noted lumbosacral tenderness and muscle spasms once, in March 2006. (Tr. 156, 159, 199, 201-04, 207-08, 244.) Moreover, x-rays of Plaintiff's spine and chest taken in 2006 were unremarkable, except for one finding of early spondylosis in Plaintiff's lower thoracic spine. (Tr. 153, 171-72.) While Plaintiff complained of back pain in early 2006, following Dr. Cabalar's prescription of Imuran in July 2006, Plaintiff consistently reported that he had been doing well, only had occasional mild low back and knee pain, and only had minimal morning stiffness. (Tr. 195-208, 244-45.) Dr. Cabalar's treatment notes from January 22, 2007 also indicate that Plaintiff stopped taking his Imuran three months earlier, providing further evidence of the inconsistency between Dr. Cabalar's MSS and her treatment notes. (Tr. 203.) *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight.")

The Court therefore finds that there was substantial evidence on the record as a whole to support the ALJ's determination that this aspect of Dr. Cabalar's opinion was unsupported by the medical evidence, and that the ALJ did not err in discounting Dr. Cabalar's opinion.

**Reliance on the VE's Testimony**

Plaintiff argues that the ALJ erred in failing to rely upon the VE's testimony that Plaintiff would be let go if he missed more than two days of work each month, or if he came in late or left early one day a week. In his decision, the ALJ recounted the VE's testimony that Plaintiff "would be unemployable if he would be absent from work an average of two or more days a month because of medical problems, or needed more than normal rest breaks to complete the work day two or more times a week, or needed to arrive late or leave the work place early once a week or more often because of medical problems." (Tr. 14.) However, the ALJ went on to state that he did not find any of those "assumptions to be valid or justified by the preponderance of the medical evidence and opinions in this record," because the medical records "show that nearly all of the time [Plaintiff's] medical conditions are stable and well controlled by medication, with very infrequent, mild, and temporary signs and symptoms." (Tr. 14.)

Because the ALJ did not find Plaintiff's subjective complaints fully credible, and because the ALJ properly discredited Dr. Cooke's and Dr. Cabalar's MSS opinions, as well as the third-party statements of Plaintiff's parents, the ALJ properly relied upon the hypothetical questions he posed to the VE which included only those impairments and restrictions that the ALJ found to be credible. *See Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) ("Discredited complaints of pain, however, are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."); *Montgomery v. Chater*, 69 F.3d 273, 275 (8th Cir. 1995); *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994). The Court finds that because the hypothetical questions relied upon

by the ALJ included those impairments the ALJ found credible, and excluded those he

discredited for legally sufficient reasons, the VE's testimony that Plaintiff could perform

work existing in substantial numbers, constituted substantial evidence in support of the

ALJ's determination.  *See Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing

*Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000) (holding that a VE need only

consider impairments supported by substantial evidence in the record and accepted by the

ALJ as true).

## ALJ's Alleged Bias

Plaintiff's last claim is that the ALJ in this case has bias against Social Security

disability claimants with similar characteristics to those Plaintiff alleges.[14]   In support of

this claim, Plaintiff has submitted statistics based on this ALJ's decisions in the 59[15]

previous cases in which the law firm representing Plaintiff represented the claimant.

These statistics show that of the 59 cases, 36 resulted in denials, for a denial rate of 61

percent,[16] as compared to a national denial rate of 38 percent.  Of the 59 cases, 23

involved obese claimants, 20 of whose claims were denied, resulting in a denial rate for

obese claimants of 86.93 percent.  Plaintiff's statistics further show that 43 of the 54

---

[14]    Plaintiff argues that, therefore, if the case is remanded, it should be remanded
to a different ALJ.  But the claim of bias, if established, would itself require reversal and
remand, and so the Court will address this claim even though Plaintiff is not entitled to a
remand based on his other arguments.

[15]    This number includes two decisions in which the law firm representing
Plaintiff represented the claimants on appeal.

[16]     This rate includes four partial favorable decisions as favorable decisions;
without these decisions, the denial rate would be 67.9 percent.

claimants alleged a mental impairment; in 36 of the 43 cases the claimant was found not to have a mental impairment, for a denial rate of 83.7 percent. Of the 59 cases, 8 alleged fibromyalgia and all were denied. Thirteen of the 59 claimants were between the ages of 18 and 34, eight of whom were denied, resulting in a denial rate for 18-34 years olds of 61.5 percent. Plaintiff has also submitted the approval/denial rates of all Social Security ALJs in St. Louis for the year 2006. These rates show that the ALJ in this case had the lowest approval rate of 36 percent, as compared to the other ALJs' approval rates ranging from 48 percent to 85 percent.

In an administrative hearing, as in a judicial proceeding, a party has a due process right to be heard by an impartial decision maker. *Keith v. Massanari*, 17 F. App'x 478, 481 (7th Cir. 2001). ALJs are presumed to be unbiased, although this presumption can be rebutted by showing a conflict of interest or some other specific reason for disqualification. *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001). The type of evidence relied upon by district courts to grant relief where bias of a particular ALJ against Social Security claimants is asserted includes (1) admissions by the ALJ indicating generalized bias or predisposition against Social Security claimants generally or certain groups specifically; (2) testimony from attorneys regarding the ALJ's regular use of incorrect law; (3) statistical evidence showing the number of cases involving problematic credibility determinations; and (4) statistical evidence showing the number of times claimants received benefits after remand or on subsequent applications. *Martin v. Astrue*, No. 2:09CV00033 JCH/DDN (E.D. Mo. May 4, 2010) (citing *Doan v. Astrue*, No. 04CV2039 DMS (RBB), 2010 WL 1031591, at *14 (S.D. Cal. Mar. 19, 2010)).

In this case, the ALJ afforded Plaintiff a hearing that lasted for almost a full hour. None of his comments or questions during the hearing show bias or disrespect to Plaintiff or his claims; nor does anything in the ALJ's written opinion display such a bias. Plaintiff has not cited this Court to any cases where an adverse decision has been overturned on the basis of the kind of statistics presented here. In four recent cases, this Court has rejected similar claims brought by Plaintiff's counsel involving this ALJ: *Perkins v. Astrue*, 2:09CV00038 AGF, 2010 WL 3908598 at *15-16 (E.D. Mo. Sep. 30, 2010); *Bowen v. Astrue*, 2:09 CV 39 DDN, 2010 WL 2653458 at *17 (E.D. Mo. June 29, 2010); *Waters v. Astrue*, 2:09 CV 28 DDN, 2010 WL 2522702, at *14 (E.D. Mo. June 16, 2010); and *Martin*, No. 2:09CV00033. Other courts take the same approach. *See Johnson v. Comm'r of Soc. Sec.*, No. 08-4901 (WJM), 2009 WL 4666933, at *4 (D.N.J. Dec. 3, 2009) ("[A]n ALJ's impartiality should not be judged by result or reputation or by statistics of how that judge has previously ruled."); *Smith v. Astrue*, No. H-07-229, 2008 WL 4200694, at *5 (S.D. Tex. Sept. 9, 2008) ("[D]istrict courts are in no position to judge what threshold percentage of 'favorable' decisions is necessary to acquit an ALJ of suspicion of intolerable bias against Social Security claimants.").

Plaintiff has not provided any evidence that the ALJ has made any derogatory statements about Social Security claimants, or that he made any statements about conserving government money. *See Doan*, 2010 WL 1031591, at *14 (referring to ALJ's statements about "no-goodnicks" and a need "to protect the public treasury "). He does not point to any regular use of incorrect legal standards by the ALJ. And significantly, he does not provide any statistics showing how many of the ALJ's decisions have been

reversed and/or remanded by the Appeals Council or a court, or how many times claimants have subsequently received benefits. The Court concludes that the statistics presented here do not rise to the level of establishing bias.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 19th day of July, 2011.